# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

ROBERT M. ALLISON,        )
                                )
          Petitioner,      )
                                )
      vs.                        )     Case No. 13-0408-CV-W-BCW-P
                                )
SCOTT LAWRENCE,        )
                                )
          Respondent.    )

## OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS AND DENYING THE ISSUANCE OF A CERTIFICATE OF APPEALABILITY

Petitioner, Robert M. Allison, filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254 on April 8, 2013, seeking to challenge his 2008 convictions and sentences for seven counts of delivery of a controlled substance, which were entered in the Circuit Court of Boone County, Missouri.

The petition raises eight grounds for relief: (1) that the trial court erred in failing to suppress evidence obtained pursuant to a valid warrant; (2) that the trial court abused its discretion when it overruled petitioner's objection to certain out of court statements; (3) that the trial court erred in allowing the prosecution to question certain witnesses about prior bad acts; (4) that the trial court erred in finding petitioner guilty because there was insufficient evidence; (5) that trial counsel was ineffective for failing to allow petitioner to testify on his own behalf; (6) that petitioner's rights under the Fourteenth Amendment were violated when the prosecution withheld criminal records and a possible deal; (7) that petitioner's rights under the Sixth and Fourteenth Amendments were violated when he was not granted the right to confront a witness; and (8) that petitioner was denied a fair trial. Respondent contends that grounds 1, 2, 3, 4, and 5, are without

merit, and the Court notes that grounds 6, 7, and 8 are procedurally defaulted.

## SUMMARY OF THE FACTS

On direct appeal, the Missouri Court of Appeals summarized the facts as follows:

> Detective Ford was an undercover narcotics officer for the Fulton Police Department who used an undercover identity. [footnote omitted] On June 19, 2004, Detective Ford and a confidential informant ("CI") met [petitioner] at the Post Office Bar & Grill. There Detective Ford agreed to buy three and a half grams of methamphetamine from [petitioner] for $200. The three went to [petitioner's] truck, and [petitioner] drove them about a block away. [Petitioner] then stopped his car and produced a softball-size bag of methamphetamine from the center console of his truck. [Petitioner] retrieved three and a half grams of methamphetamine from the bag, rolled the drugs up in a dollar bill, and gave the drugs to the CI. [Petitioner] returned the men to the bar parking lot. The CI later gave the drugs to Detective Ford. Subsequent testing confirmed the substance was methamphetamine, a controlled substance.

> On April 26, 2005, Detective Ford and the CI met with [petitioner] at [petitioner's] auto body shop, K & R Garage. The meeting was scheduled after [petitioner] contacted the CI to ask if he "wanted any medicine." The CI reported the call to Detective Ford who told the CI to call [petitioner] back to arrange a meeting. At the meeting, [petitioner] gave the CI ten pills. Subsequent testing showed the pills to be oxycodone, a controlled substance.

> On May 24, 2005, Detective Ford and the CI again met with [petitioner] at his auto body shop. [Petitioner] told them that he had forty morphine pills that he did not want. Detective Ford offered to buy the pills from [petitioner]. [Petitioner] accepted Detective Ford's offer and retrieved two bags containing the pills. Subsequent testing confirmed the pills were morphine, a controlled substance.

> On June 1, 2005, Detective Ford and the CI met with [petitioner] at [petitioner's] apartment in Auxvasse, Missouri. [Petitioner] offered Vicodin to both men. Both men accepted the pills. Subsequent testing confirmed the pills were Vicodin, which contains hydrocodone, a controlled substance.

> On July 18, 2005, Detective Ford and the CI met with [petitioner] at

1382 Blue Ridge. [footnote omitted] They discussed purchasing methamphetamine from [petitioner]. [Petitioner] did not have any methamphetamine. [Petitioner] offered OxyContin pills to both men, which both men accepted. Subsequent testing confirmed the pills to be oxycodone, a form of OxyContin, a controlled substance.

On July 29, 2005, Detective Ford and the CI met with [petitioner] at [petitioner's] apartment to purchase methamphetamine. Cassie Allison, a minor, was present. [Petitioner], Detective Ford, and the CI went into [petitioner's] bedroom and closed the door. [Petitioner] retrieved a bag from his closet and set it on top of a dresser. [Petitioner] pulled out a large triple-beam scale. [Petitioner] then retrieved a bag of methamphetamine and measured out an ounce. The purchase price was $1,200. Detective Ford told [petitioner] that he only had $800. [Petitioner] replied that he trusted Detective Ford. Detective Ford told [petitioner] that he would pay him the balance the next day. Detective Ford returned the next day with the $400 balance. Subsequent testing confirmed the substance purchased at [petitioner's] apartment was 27.8 grams of methamphetamine.

On September 1, 2005, Detective Ford, the CI, and [petitioner] met at the CI's apartment in Fulton. Detective Ford agreed to purchase two pounds of marijuana from [petitioner] for $1,350. Detective Ford went to his vehicle, retrieved the money, and gave it to [petitioner]. [Petitioner] then made a phone call because he did not have the marijuana with him. [Petitioner] told Detective Ford to drive to [petitioner's] apartment to pick up the marijuana. Detective Ford did so. Cassie Allison was waiting for him. She produced a block of marijuana from under her shirt and handed it to Detective Ford. Subsequent testing confirmed the substance to be 885 grams of marijuana, a controlled substance.

[Petitioner] was charged as a prior and persistent offender with nine counts of the class B felony of delivery of a controlled substance in Callaway County. A motion for change of venue was granted, and venue was moved to Boone County. Counts 2 and 8 were dismissed by the State prior to trial. [footnote omitted]

Following a jury trial, [petitioner] was found guilty of the remaining seven counts. The trial court sentenced [petitioner] to twenty years on each count, to run concurrently.

(Doc. No. 7, Ex. 3, pp. 2-4).

Before the state court findings may be set aside, a federal court must conclude that the state court's findings of fact lack even fair support in the record. Marshall v. Lonberger, 459 U.S. 422, 432 (1983). Credibility determinations are left for the state court to decide. Graham v. Solem, 728 F.2d 1533, 1540 (8th Cir. en banc 1984). It is petitioner's burden to establish by clear and convincing evidence that the state court findings are erroneous. 28 U.S.C. § 2254 (e)(1).[1] Because the state court's findings of fact have fair support in the record and because petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers to and adopts those factual conclusions.

## GROUND 1

In ground 1, petitioner claims that the trial court erred in admitting evidence that allegedly was obtained in violation of the Fourth Amendment.

Petitioner's ground for relief is barred from federal habeas corpus review by the doctrine of Stone v. Powell, 428 U.S. 465 (1976). "[W]here the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id., at 482. See also Willett v. Lockhart, 37 F.3d 1265, 1271-73 (8th Cir. 1994) (adopting two-part Second Circuit test for Stone bar).

Because the record reflects that the state provided petitioner with an opportunity to fully

---

[1] "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

and fairly litigate his Fourth Amendment claim, the bar of <u>Stone v. Powell</u> applies here, and ground 1 will be denied.

## GROUNDS 2, 3, & 4

In ground 2, petitioner contends that the trial court abused its discretion when it overruled petitioner's objection to certain out of court statements. In ground 3, petitioner contends that the trial court erred in allowing the prosecution to question certain witnesses about prior bad acts. In ground 4, petitioner contends that the trial court erred in finding petitioner guilty of Count 2 because there was insufficient evidence. Review of claims regarding evidence at trial is extremely deferential to the state courts. Constitutionally sufficient evidence exists to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).

On direct appeal, the Missouri Court of Appeals held as follows:

### *Point II*

In his second point on appeal, [petitioner] argues that the trial court erred in overruling his objection to Detective Ford's testimony relaying a statement made to him by the CI. [Petitioner] maintains that the CI's out of court statement was testimonial hearsay which violated his rights under the Confrontation Clause because the CI was not available for cross examination.

### *Standard of Review*

A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *State v. Coats*, 835 S.W.2d 430, 433 (Mo. App. E.D. 1992). An abuse of discretion only exists if "a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *State v. Kemp*, 212 S.W.3d 135, 145 (Mo. banc 2007) (citation omitted). However, whether [petitioner's] constitutional rights under the

Confrontation Clause were violated is a question of law that we review *de novo*.

### *Analysis*

At trial Ford testified regarding events that took place on April 25, 2005, and stated:

> A: I had my confidential informant with me again.
>
> Q: Okay. In your interaction with [petitioner] on that particular date, did the issue of drugs come up then?
>
> A: Yes.
>
> Q: And how did they come up then?
>
> A: [Petitioner] contacted my confidential informant and asked him if he wanted any medicine.
>
> [Petitioner's] Counsel: Well, your Honor, that is based on hearsay I believe. This witness wasn't present for that conversation.
>
> The Court: Objection will be overruled.
>
> Q: And what, if anything, did you do in response to Mr.– the discussion of medicine?
>
> A: I directed my confidential informant to call [petitioner] back and tell him yes, he was interested in some medicine, and that we would go to his shop, his garage, and meet him there.
>
> [Petitioner's] Counsel: Your Honor, I also want to offer the objection that I think this particular testimony is self-serving.
>
> The Court: Objection will be overruled.

[Petitioner] maintains that the conversation between [petitioner] and the CI is inadmissible hearsay. We disagree.

It is discernible from the questions asked that Detective Ford's testimony about the conversation with the CI was not offered to prove the truth of the matter asserted– that [petitioner] contacted the CI and offered to sell him "medicine." Rather, it is evident from the questions asked that the testimony was elicited to explain Detective Ford's subsequent conduct. "[A]n out-of-court statement offered not for the truth of the matter asserted, but to explain subsequent police conduct, is not hearsay and is therefore, admissible assuming it is relevant." *State v. Douglas*, 131 S.W.3d 818, 824 (Mo. App. W.D. 2004). "It is well established that such testimony is admissible to explain the officer's conduct, supplying relevant background and continuity to the action." *State v. Brooks*, 618 S.W.2d 22, 25 (Mo. banc 1981). "However, when such out-of-court statements go beyond what is necessary to explain subsequent police conduct, they are hearsay." *Douglas*, 131 S.W.3d at 824. Detective Ford's testimony relating to [petitioner's] offer to sell the CI "medicine" did not go beyond what was reasonably necessary. The testimony provided the jury with an explanation for Detective Ford's direction to the CI to arrange a meeting with [petitioner] at [petitioner's] garage.

As a result, the conversation between [petitioner] and the CI was not offered to prove that [petitioner] in fact offered to sell the CI medicine. Thus, the Confrontation Clause is not implicated. n.6 *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (ruling that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). Point two is denied.

> n.6 We also note that "[a] hearsay objection does not preserve constitutional claims relating to the same testimony." *State v. Chambers*, 891 S.W.2d 93, 104 (Mo. banc 1994). "To preserve appellate review, constitutional claims must be made at the first opportunity, with citation to the specific constitutional sections." *Id.* at 103-04. [Petitioner's] trial counsel did not make a specific objection at trial relating to the constitutionality of the admission of the CI's conversation with [petitioner]. Thus, even had Detective Ford's testimony about the conversation been testimonial hearsay, the claim that [petitioner's] constitutional rights had been violated would not have been

properly preserved for our review.

### Point III

In his third point on appeal, [petitioner] claims that the trial court plainly erred in allowing the State to cross-examine defense witness Edward Field ("Field") and James Allen ("Allen") regarding drug sales which allegedly involved Detective Ford, and in allowing the State to offer Detective Ford's rebuttal testimony concerning these alleged sales. [Petitioner] complains that this testimony constituted improper impeachment with prior unconvicted misconduct.

### Standard of Review

[Petitioner] concedes that he did not preserve this point on appeal because he failed to object to any of the aforementioned testimony during trial. [Petitioner] requests plain error review pursuant to Rule 30.20. Review of plain error under Rule 30.20 involves a two-step process. "First, we must determine if the claim on its face establishes substantial grounds to find that manifest injustice or miscarriage of justice has resulted." *State v. Lewis*, 243 S.W.3d 523, 525 (Mo. App. W.D. 2008). Not all prejudicial error can be deemed plain error. *State v. Calhoun*, 259 S.W.3d 53, 58 (Mo. App. W.D. 2008). "Plain error is evident, obvious, and clear error." *Id.* If plain error is evident on the face of the claim, then we may proceed to consider whether or not a miscarriage of justice or manifest injustice will occur if left uncorrected. *Lewis*, 243 S.W.3d at 525. Where no plain error appears on the face of the claim, we should decline to exercise our discretion to review the claim. *Id.* For the reasons hereinafter discussed, no plain error appears on the face of [petitioner's] claim, and we decline to exercise our discretion to review the claim.

### Analysis

Detective Ford was called as a witness in the State's case. Ford testified on direct examination that whenever he and his CI were involved in a drug buy, he would check the CI for drugs, he would always maintain eye contact with his CI, and he would immediately take whatever drugs were obtained in the drug buy from the CI and package them as evidence.

On cross-examination, [petitioner] attempted to impeach Detective

Ford's credibility by asking whether Detective Ford had ever witnessed the CI using illegal drugs. Detective Ford denied that he had ever witnessed the CI using illegal drugs.

[Petitioner] called Field, who testified that he had witnessed the CI smoking crack cocaine in Detective Ford's presence on more than twenty different occasions. Field testified that there was no doubt in his mind that the CI was actually smoking crack cocaine and was not just pretending. On cross-examination by the State, Field conceded that he did not want anyone to believe Ford's testimony, because Ford was currently "bringing down trouble on [his] brother." The State asked Field whether he had sold drugs to Detective Ford on two separate occasions. Field denied that he sold drugs to Ford.

[Petitioner] called Allen, who testified that he had seen the CI on three occasions in the presence of Detective Ford smoking out of a glass tube that he put white rocks into and lit. On cross-examination, the State asked Allen if he had a "particular stake in whether or not people believe Detective Ford?" Allen testified that he did not. The State asked Allen if it was true that he had used his fiancée to negotiate the sale of narcotics with Detective Ford. Allen denied this activity.

The State then recalled Detective Ford in rebuttal. Detective Ford testified that he had never in his thirteen years as an undercover narcotics agent allowed a confidential informant to use drugs in his presence. Detective Ford also testified that he never saw the CI smoke crack in his presence and that he would not use someone as an informant if they used drugs in his presence. Detective Ford further testified that Allen had sold him methamphetamine via his girlfriend and that Field had sold him OxyContin and methamphetamine.

This summarized testimony reveals four separate efforts at impeachment. First, [petitioner] attempted to impeach Detective Ford by asking Detective Ford about the CI's use of drugs in his presence. Second, [petitioner] elicited testimony from Field and Allen to rebut Detective Ford's denial of the CI's use of drugs in his presence. Third, the State attempted to impeach both Field and Allen by questioning each of them about their potential bias and about prior drug sales to Detective Ford. Fourth, the State elicited Detective Ford's testimony to rebut Field's and Allen's

testimony about the CI's use of drugs in his presence and to rebut Field's and Allen's denial of drug sales to Detective Ford. The first and third efforts involved impeachment of a witness through cross examination about prior conduct. The second and fourth efforts involved impeachment of a witness through the introduction of extrinsic evidence. [Petitioner] only complains, of course, about the third and fourth efforts at impeachment which were undertaken by the State, as the first and second efforts involved [petitioner's] efforts to impeach Detective Ford.

The proper methods for impeaching a witness were exhaustively explored by our Supreme Court in *Mitchell v. Kardesch*, 313 S.W.3d 667, 676-77 (Mo. banc 2010). Impeachment efforts fall, roughly, into two categories– impeachment by cross examination inquiry involving specific conduct, and impeachment through the introduction of extrinsic evidence.

During *cross examination*, a witness may be impeached at anytime by *inquiring of the witness* about *any matter* (even a collateral matter) involving (1) the witness's ability to perceive, (2) the witness's bias, (3) the witness's prior inconsistent statements, (4) the witness's prior convictions, or (5) evidence of the witness's character for truthfulness and veracity. n.7 *Id.* at 675. The latter category– evidence of a witness's character for truthfulness and veracity– generates the greatest confusion. "When a person, regardless of whether a party, is being questioned on the witness stand...that...person may be asked about specific instances of his or her own conduct that *speak to his or her own character for truth or veracity....*" *Id.* at 677 (emphasis added). There is no hard and fast rule for determining when a specific instance of conduct speaks to a witness's truth or veracity. However, it is clear that this limitation would not permit inquiry about every prior bad act. Bad moral character and character for truth and veracity are not synonymous.

> n.7 Evidence of a witness's character for truth and veracity (both favorable and unfavorable) can also be shown through the testimony of another witness. However, such a witness is only permitted to testify "about the other person's general reputation in the community for truth and veracity." *Id.* at 677. "Only once the witness has testified to the other's reputation may he or she be cross-examined in good

faith about specific instances or conduct, and even then only as a means of testing the accuracy of the witness's testimony about the other's reputation for truthfulness by asking whether the person on the stand has 'heard about' a particular matter."   *Id.* at 678.

If a witness on cross examination *denies* the matter about which inquiry had been made, the question turns on whether the witness's denial is binding on the questioner, precluding further inquiry or extrinsic proof.   The ability to use *extrinsic evidence* to impeach (that is to say, documentary or testimonial evidence offered to combat a witness's denial of a matter during cross examination) varies depending on the method of impeachment employed.   *Id.* at 679.   "Parties are permitted to introduce extrinsic evidence to impeach a witness by showing his or her inability to perceive the events testified to; prior convictions; or to show bias, prejudice or interest in the proceeding, *regardless of whether the subject of the extrinsic evidence is independently material to the case.*"   *Id.* (emphasis added).   Parties are permitted to introduce extrinsic evidence of a witness's prior inconsistent statement *if the subject of the prior inconsistent statement is material to the issues rather than collateral.   Id.* at 679-80.   Following *Mitchell*, parties are permitted a *limited* ability to use extrinsic evidence of prior conduct involving a witness's character fro truth and veracity *following the trial court's determination* "*whether admission of the extrinsic evidence would be more probative or more prejudicial.*" *Id.* at 682 (emphasis added).   With respect to this latter category of extrinsic evidence, "[i]n cases involving character of the witness for truth and veracity, it will be the usual case where the balancing weighs in favor of admission of extrinsic evidence."   *Id.*   n.8

> n.8 It does not appear that *Mitchell* has changed the general rule that a prior inconsistent statement that is itself material to the issues in the case can be offered as extrinsic evidence to impeach.   There is confusion on this point, but only because the extrinsic evidence involved in *Mitchell* happened to be an interrogatory answer by the witness that his license to practice medicine had never been suspended.   *Id.* at 670.   The witness later admitted in a deposition that his license had been suspended and that the interrogatory answer was

false. *Id.* The trial court would not permit the plaintiff to impeach the witness (who was the defendant) by asking him about the admission in his deposition. As a result, the trial court would not permit the plaintiff to use the deposition or the interrogatory answer as extrinsic evidence should the witness have denied the deposition admissions during cross examination. Though the extrinsic evidence included the deposition and a prior sworn interrogatory answer, neither was sought to be used as a prior inconsistent statement but, instead, as extrinsic evidence of prior conduct that was relevant to the witness's character for truth and veracity. *Id.*

We apply the holdings of *Mitchell* to the four efforts at impeachment in this case. First, [petitioner's] inquiry of Detective Ford about the CI's use of drugs in his presence was proper impeachment. [Petitioner] cross examined Detective Ford about specific conduct relating to the Detective's character for truth and veracity, as Detective Ford had just testified on direct examination that he had never permitted the CI to use drugs in his presence. Detective Ford denied permitting the CI to use drugs in his presence on cross examination.

Second, [petitioner] introduced extrinsic evidence of Detective Ford's lack of character for truth and veracity via the direct examination of Field and Allen that, in fact, the CI had never used drugs in Detective Ford's presence. This was not proper impeachment, as this was not "the unusual case" where the balancing of probative value and prejudicial effect would have weighed in favor of admission of the extrinsic evidence.

Third, the State inquired of Field and Allen on cross examination about their personal dislike of Detective Ford, and then asked about prior drug sales to Detective Ford for the arguable purpose of demonstrating a motivation for their bias. In the alternative, the questions asked of Field and Allen about prior drug sales to Detective Ford arguably related to their character for truth and veracity. n.9 In either case, this was proper impeachment. As previously noted, a witness can be asked about *any* conduct on cross examination, even conduct relating to collateral matters, if the conduct relates to one of the recognized categories of impeachment. *Id.* at 675.

n.9 We do not mean to suggest that inquiries about prior unconvicted criminal activity should be construed as universally relevant to a witness's character for truth and veracity, and in fact, we caution against such an assumption. But where, as here, no objection has been made to preserve a claim of error, we cannot conclude that a manifest injustice has occurred when such conduct has been inquired into, as the questioner could have made a case, had a timely objection been registered, that the inquiry was relevant to the witness's character for truth and veracity.

Fourth, the State called Detective Ford in rebuttal. Detective Ford's testimony introduced extrinsic evidence of Field's and Allen's denied drug sales. If offered as extrinsic evidence on the subject of these witnesses' character for truth and veracity, the testimony would have been problematic, absent application of the balancing test required by *Mitchell*. However, this extrinsic evidence could have been offered to show that these witnesses were biased against Detective Ford, as the conduct could reveal that the witnesses were interested in challenging Detective Ford's credibility in order to satisfy a personal agenda. As previously noted, extrinsic evidence offered to show bias is generally admissible, even if the evidence involves a collateral matter. *Id.* at 679. Because it is possible on this record that Detective Ford's rebuttal testimony represented proper impeachment in the form of bias, we are not prepared to exercise our discretion to conduct plain error review.

In any event, [petitioner] "opened the door" to the State's impeachment efforts about which he now complains. [Petitioner] improperly introduced extrinsic evidence through the testimony of Field and Allen about the CI's use of drugs in Detective Ford's presence for the purpose of impeaching Detective Ford's character for truth and veracity. In fact, this appears to have been a purposeful trial strategy undertaken by [petitioner]. [Petitioner] concedes that [petitioner's] "entire defense relied on the lack of credibility of [Detective] Ford." [Appellant's Br., pg. 19]. [Petitioner] argues that the State's discrediting of Field and Allen "on the very important issue of whether [Detective] Ford lied under oath with respect to the conduct of his [CI]" was manifestly unjust.

[Appellant's Br., pg. 19]. However, [petitioner] ignores that he invited the State's impeachment of Field and Allen by first engaging in improper extrinsic evidence impeachment of Detective Ford. We are not inclined to afford [petitioner's] claim plain error review under these circumstances. Point Three is denied.

### *Point IV*

In his fourth point on appeal, [petitioner] claims that the trial court erred in entering judgment finding him guilty of Count 2 because the State dismissed Count 2. [Petitioner] maintains that he could not have been convicted of this count because there was no evidence presented at trial regarding this charge.

The State concedes that the judgment entered by the trial court is in error not only in this respect but also by improperly stating that Count 9 was dismissed. The State argues that the judgment reflects a clerical error, as it should have shown Count 2 was dismissed, and that [petitioner] was convicted of Count 9. Both counts were for the same charge– delivery of a controlled substance– though the counts obviously involved different factual predicates. The State urges that the trial court's judgment should be corrected by a *nunc pro tunc* order.

At trial, the factual predicates for Count 2 and Count 8, which the State had previously dismissed, were not submitted to the jury. For the purposes of instructing the jury, however, the remaining seven counts (Counts 1, 3-7, and 9) were renumbered in seven separate verdict directors, such that Count 1 was called Count I, Count 3 was called Count II, Count 4 was called Count III, Count 5 was called Count IV, Count 6 was called Count V, Count 7 was called Count VI, and Count 9 was called Count VII. It is clear by comparing to the Indictment that each verdict director, though referencing a renumbered count for purposes of the instruction, correctly referenced the specific date and the involved controlled substance for the corresponding count of the Indictment. The jury found [petitioner] guilty of each of the seven counts submitted, with each verdict reflected on a separate verdict form.

When the trial court imposed sentencing, it noted on the record that Counts 2 and 8 shown on the Indictment had been dismissed. However, the trial court's written judgment, though noting that [petitioner] had been convicted of seven counts, improvidently noted a conviction of Count 2 as shown on the Indictment, even

though that charge involved a date and a controlled substance not submitted to the jury, and improvidently noted that Count 9 had been dismissed, even though that charge involved a date and a controlled substance which had been submitted to the jury in Instruction No. 12. It is apparent that the trial court mistakenly recorded [petitioner's] convictions in the judgment using the count designations from the jury instructions (Counts I through VII) instead of the count designations from the Indictment (Counts 1, 3-7, and 9).

The error on the judgment form is a clerical error, which is clearly discernable from the record. As such there is a bases to support the amendment of the judgment *nunc pro tunc* in order to correctly reflect [petitioner's] convictions. *State v. Partain*, 310 S.W.3d 765, 769 (Mo. App. E.D. 2010); *State v. Carroll*, 207 S.W.3d 140, 142 (Mo. App. E.D. 2006); Rule 74.06(a). "The purpose of a nunc pro tunc order is to correct clerical omissions or mistakes so that the record speaks the truth by evidencing an act done or a judgment actually rendered at a prior time but not carried into or properly recorded in the record." *Andrae v. Andrae*, 171 S.W.3d 170, 172 (Mo. App. E.D. 2005); *Pirtle v. Cook*, 956 S.W.2d 235, 243 (Mo. banc 1997) (finding that a *nunc pro tunc* order was proper to correct a clerical error in the judgment which was a result of transposed terms).

Here, [petitioner] concedes in his Reply Brief that the error described by the State in its Brief was made and should be corrected. There is, therefore, no dispute that the entry of a *nunc pro tunc* order is an appropriate avenue to conform the trial court's judgment to the balance of the record.

As all seven of the counts of which [petitioner] was convicted were for the same charge, delivery of a controlled substance, range of punishment were all the same, Class B Felony, and as the sentence for each conviction was identical, we see no inherent value in remanding this case for entry of an amended judgment to correct this conceded clerical error. Instead, we will exercise our power pursuant to Rule 30.23 to enter such judgment as the court ought to give as to finally dispose of this case.

(Doc. No. 7, Ex. 3, pp. 5-22).

The resolution of grounds 2, 3, and 4 by the state court did not result in "a decision that

was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 412 (2000).[2]

Grounds 2, 3, and 4 are denied.

## GROUND 5 – INEFFECTIVE ASSISTANCE OF COUNSEL

In ground 5, petitioner contends that trial counsel was ineffective for failing to call petitioner to testify on his own behalf. In order to succeed on a claim of ineffective assistance of counsel, petitioner must establish that: (1) his counsel's performance was unreasonable as viewed in the totality of the circumstances; and (2) his defense was prejudiced by counsel's action in that there is a reasonably probability that, but for counsel's unprofessional acts, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 694-95 (1984); Schaeffer v. Black, 774 F.2d 865, 867 (8th Cir. 1985). Reasonably effective assistance of counsel may be defined as the skill and diligence that a reasonably competent attorney would exercise under similar circumstances. See, e.g., Strickland v. Washington, 466 U.S. at 687-90. Judicial scrutiny of counsel's performance must be highly deferential, id. at 689,

---

[2]According to the concurrence of Justice O'Connor, joined by four other members of the Court, "under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413, 120 S.Ct. at 1523.

and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.

On appeal from the denial of his Rule 29.15 motion, the Missouri Court of Appeals disposed of petitioner's claims as follows:

> [Petitioner's] only point on appeal is that he received ineffective assistance when his trial counsel failed to call him to testify on his own behalf, despite his request to do so. A defendant has a fundamental constitutional right to testify in his or her own defense, and only the defendant may waive that right. *Simmons v. State*, 100 S.W.3d 143, 146 (Mo. App. E.D. 2003); *State v. Fanning*, 939 S.W.2d 941, 949 (Mo. App. W.D. 1997). "[T]he defendant's waiver of his right to testify, like his waiver of other constitutional rights, should be made voluntarily and knowingly." *State v. Blewett*, 853 S.W.2d 455, 460 (Mo. App. W.D. 1993). Generally, trial counsel's judgment and advice regarding whether a defendant should testify is a matter of trial strategy. *Hickey v. State*, 328 S.W.3d 225, 231 (Mo. App. E.D. 2010). Such advice is not a ground for post-convictions relief, absent exceptional circumstances. *Id.*
>
> [Petitioner] claims that, prior to the commencement of trial he informed his trial counsel of his desire to testify, but that trial counsel failed to call him. The fundamental defect in [petitioner's] appeal is that the motion court did not believe his claim that he requested to testify before trial began, but that counsel ignored the request. [Petitioner] has failed to show that the motion court's disbelief of his testimony on this point was clearly erroneous; indeed, rather than attacking the trial court's contrary finding, [petitioner's] appellate briefing proceeds on the assumption that he in fact made an unfulfilled request to testify.
>
> [Petitioner] fails to acknowledge that the motion court was not required to believe his testimony. "At a post-conviction relief evidentiary hearing, the motion court determines the credibility of the witnesses and is free to believe or disbelieve the testimony of any witness, including that of the Movant." *Gapske v. State*, 358 S.W.3d 566, 569 (Mo. App. S.D. 2012), *quoting Hurst v. State*, 301 S.W.3d 112, 117 (Mo. App. E.D. 2010). In this case, the evidence fully supports the motion court's disbelief of [petitioner's] testimony

that he asked to testify. Trial counsel testified that his practice was to discuss testifying with all clients who went to trial, and that he generally advised against testifying where clients had prior convictions. [Petitioner] acknowledged that such a discussion occurred in this case. Counsel also testified that he recognized that the decision as to whether to testify was for the client, and that he would not have stopped [petitioner] from testifying if he had desired to do so. While counsel allowed that [petitioner] may have expressed an interest in testifying, counsel recalled no "battle" over the issue, and testified that, if [petitioner] had expressed such a desire, counsel may have said "'Robert, that's your decision, but I think you might want to reconsider that.'" PCR Tr. 48. This testimony supports the inference that [petitioner] chose to follow counsel's advice and chose not to testify, despite initially having a contrary inclination. The defense strategy of not having [petitioner] testify was implemented from voir dire through jury instructions. Although [petitioner] was explicitly informed by the trial court that he had a right to testify, and was given the opportunity to voice complaints regarding counsel's performance at sentencing, he apparently expressed no concerns that he was denied his right to testify until the filing of his *amended* post-conviction relief motion, more than two years after trial and conviction. (Notably, [petitioner's] original, *pro se*, Rule 29.15 motion raised no right-to-testify claim, although that motion was forty-one pages long and asserted ten claims, including two claims alleging that counsel provided ineffective assistance by failing to call particular witnesses.)

Finally, [petitioner] acknowledged at the evidentiary hearing that, despite purportedly having requested to testify *before trial began*, he never reiterated that request during trial itself. [Petitioner] offered the following explanation for his failure to renew his request during trial, which the motion court evidently found unpersuasive:

> Q: Okay. At any point after that did you tell Mr. Viets, during your part of the case, "I want to testify," and then he told you, "No" or he prevented you–
>
> A: I didn't have a chance to tell him anything. I didn't have the opportunity to tell him.
>
> Q: You weren't in custody, were you?

A: No, I wasn't in custody, but I was sitting at one end of the table where his wife was relaying the messages.

Q: And there were recesses during the trial, were there not?

A: Yeah, there were recesses, but I mean, I didn't get to talk to Dan much.

Q: So is it my understanding you're saying you did not tell him that?

A: That I wanted to testify?

Q: Right.

A: I told him before trial. And that was– that's the only time I ever, I mean, that anything was mentioned about testifying.

Tr. 33:24-34:19.

[Petitioner] highlights the fact that, although the trial court advised him on the record of his right to testify (or not to testify), the court failed to specifically ask him whether he would like to testify. This Court finds no such requirement in the case law. Although this Court has recognized that the "prudent course of action is for the trial court to voir dire the defendant" regarding whether or not he or she chooses to testify, the "trial court has no duty to inquire from a criminal defendant who remains silent throughout the proceedings regarding whether he or she will testify." *State v. Edwards*, 173 S.W.3d 384, 386 (Mo. App. E.D. 2005).

### Conclusion

We affirm the circuit court's judgment denying [petitioner's] motion for post-conviction relief under Rule 29.15.

(Doc. No. 7, Ex. 6, pp. 5-8).

The resolution of ground 5 by the state court did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 412 (2000). Applying the Strickland standard of review to the facts as set forth in the record, the Court finds that counsel was not ineffective.

Ground 5 is denied.

## GROUNDS 6, 7, & 8 – PROCEDURAL DEFAULT

Petitioner's remaining grounds are procedurally defaulted. In Coleman v. Thompson, 501 U.S. 722 (1991), the Supreme Court held:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Id. at 750. Cause, actual prejudice, and the probability of a "fundamental miscarriage of justice" are to be judged under criteria set out in Wainwright v. Sykes, 433 U.S. 72 (1977), and Murray v. Carrier, 477 U.S. 478 (1986). Coleman, 501 U.S. at 748-50.

A review of the record shows that, although petitioner presented the claims at issue in his amended Rule 29.15 motion, petitioner did not raise them on appeal from the denial of that motion. Therefore, those claims are procedurally defaulted and may not be reviewed by this Court unless petitioner can demonstrate cause and actual prejudice, or that failure to consider his claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. The

Court will not reach the "prejudice" component of the analysis unless it first finds that the petitioner has demonstrated "cause" for his procedural default.

Petitioner does not present any valid explanation for why these grounds were not pursued on appeal from the denial of his Rule 29.15 motion and, therefore, has failed to demonstrate cause for his procedural default.   As a result, we do not consider prejudice.   The Court, however, can still reach the merits of his claims if petitioner can show that he is "probably actually innocent" of the crimes for which he was convicted.   Bowman v. Gammon, 85 F.3d 1339, 1346 (8th Cir. 1996), cert. denied, 520 U.S. 1128 (1997).   To demonstrate his innocence, petitioner must satisfy a two-part test: First, he must support his allegations of constitutional error   "with new reliable evidence. . . that was not presented at trial."   Second, he must establish "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id., citing Schlup v. Delo, 513 U.S. 298 (1995).   Petitioner fails to make this showing.

Petitioner has failed to show cause for his default of grounds 6 through 8.   He does not show that a manifest injustice will occur if these grounds are not reviewed on the merits, and he has failed to meet the Schlup standard for actual innocence.   Id.   Therefore, federal review of grounds 6 through 8 is barred.

Grounds 6 through 8 are denied.

## CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c), the Court may issue a certificate of appealability only "where a petitioner has made a substantial showing of the denial of a constitutional right."   To satisfy this standard, a petitioner must show that a "reasonable jurist" would find the district court ruling on the constitutional claim(s) "debatable or wrong."   Tennard v. Dretke, 542 U.S. 274, 276

(2004). Because petitioner has not met this standard, a certificate of appealability will be denied. <u>See</u> 28 U.S.C. § 2254, Rule 11(a).

## <u>ORDER</u>

Accordingly, it is **ORDERED** that:

(1) the above-captioned petition for a writ of habeas corpus is denied;

(2) this case is dismissed with prejudice; and

(3) the issuance of a certificate of appealability is denied.

   /s/ Brian C. Wimes
BRIAN C. WIMES
UNITED STATES DISTRICT JUDGE

Kansas City, Missouri,

Dated:  July 26, 2013.